## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

ASSOCIATED TERMINALS OF                              CIVIL ACTION
ST. BERNARD, LLC

VERSUS                                                      No. 17-5109

POTENTIAL SHIPPING HK CO.
LTD. ET AL.                                              SECTION I

## ORDER AND REASONS

On May 19, 2017, longshoremen employed by Associated Terminals of St. Bernard, LLC ("Associated Terminals") boarded the M/V UNISON POWER ("ship") and proceeded to use the ship's no. 2 crane to offload wire coil from the ship to a barge anchored alongside the ship. In the process of moving these coils, the no. 2 crane's wire rope snapped, causing a load of wire coils weighing tens of tons to fall onto the barge. Jamaal Ford ("Ford")—who was employed as a forklift operator for Associated Terminals at the time and was working on the barge that day—alleges that the load's impact with the barge propelled him forward into the forklift that he was mounting at the time, thereby injuring him.

Ford intervened in this case and asserted a negligence claim under the Longshore and Harbor Worker's Compensation Act ("LHWCA") against Potential Shipping HK Co. Ltd, *in personam* and as owner of the M/V UNISON POWER, *in rem* ("Potential Shipping"). Potential Shipping denies liability and contests the extent of Ford's injuries.

Over the course of just over two days, the Court held a bench trial in this case. This opinion is the result.

1

# I.

## A.

The LHWCA "establishes a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death." *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 96 (1994).

> Under [the] LHWCA, which is similar to other worker compensation schemes, an employer's liability to an employee who is injured on the job is essentially limited to payment of compensation. The LHWCA also allows the employee to recover for injuries resulting from the fault of third parties. The employee need not choose whether to receive compensation or to recover damages against a third person; he can do both.

*Fontenot v. Dual Drilling Co.*, 179 F.3d 969, 972 (5th Cir. 1999) (internal citations omitted).

Thus, the LHWCA provides a longshoreman such as Ford[1] with an avenue through which to "seek damages in a third-party negligence action against the owner of the vessel on which he was injured." *Howlett*, 512 U.S. at 96. "The right of ship repairers, longshoremen, and other persons covered by the [LHWCA] to sue a vessel owner for negligence arises exclusively under 33 U.S.C. § 905(b)," which Congress added to the LHWCA in 1972. *Garry v. Exxon Mobil Corp.*, No. 03-0791, 2004 WL 2367706, at *2 (E.D. La. Oct. 19, 2004) (Africk J.), *aff'd*, 150 Fed. App'x 363 (5th Cir.

---

[1] "The LHWCA covers a worker for any injury if he is engaged in maritime employment, provided that he meets a two-fold test: (1) his injury must occur within an area adjoining navigable waters of the United States, known as the 'situs' test, and (2) the nature of the work performed by him must be maritime in nature, known as the 'status' test." *McLaurin v. Noble Drilling (US) Inc.*, 529 F.3d 285, 289 (5th Cir. 2008). The parties do not dispute that the LHWCA covers Ford in this case.

2005) (per curiam); *see Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 165 (1981) (observing that, with the 1972 amendments to the LHWCA, "the longshoreman's right to recover for unseaworthiness was abolished" and "his right to recover from the shipowner for negligence was preserved in § 905(b), which provided a statutory negligence action against the ship").

Section 905(b) provides, in relevant part:

> In the event of injury to a person covered under [the LHWCA] caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of [Title 33 of the United States Code], and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under [the LHWCA].

In *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981), the Supreme Court "limited the duties vessel owners owe under § 905(b)." *Kirksey v. Tonghai Maritime*, 535 F.3d 388, 391 (5th Cir. 2008). Specifically, the *Scindia* Court "outlined three duties [that] shipowners owe to longshoremen: 1) the 'turnover duty,' relating to the condition of the ship upon the commencement of stevedoring operations; 2) the duty to prevent injuries to longshoremen in areas remaining under the 'active control'

of the vessel;[2] and 3) the 'duty to intervene.'"[3] *Moore v. M/V ANGELA*, 353 F.3d 376, 380 (5th Cir. 2003) (quoting *Howlett*, 512 U.S. at 98). This case implicates the turnover duty.

"The turnover duty applies to the shipowner's obligation before or at the commencement of the stevedore's activities." *Kirksey*, 535 F.3d at 392. Worded differently, "[t]he 'turnover duty' relates to the condition of the ship upon the commencement of stevedoring operations." *Moore*, 353 F.3d at 380 (citing *Scindia*, 451 U.S. at 167); *see also Howlett*, 512 U.S. at 99 (pointing out that "[m]ost turnover cases brought under § 5(b) concern the condition of the ship itself or of equipment on the ship used in stevedoring operations").

"This duty places two responsibilities on the vessel owner." *Kirkley*, 535 F.3d at 392. First, the owner

> must "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property."

---

[2] "This duty recognizes that although a vessel owner no longer retains the primary responsibility for safety in a work area turned over to an independent contractor, no such cession results as relates to areas or equipment over which the vessel's crew retains operational control." *Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34 (5th Cir. 1997).

[3] The duty to intervene is implicated where "the vessel owner fails to intervene in the stevedore's operations when he has actual knowledge both of the hazard and that the stevedore, in the exercise of obviously improvident judgment, means to work on in the face of it and therefore cannot be relied on to remedy it." *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1245 (5th Cir. 1997) (quoting *Pimental v. LTD Canadian Pacific Bul*, 965 F.2d 13, 15 (5th Cir. 1992)) (internal quotation marks omitted) (emphasis removed).

*Howlett*, 512 U.S. at 98 (quoting *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416-17 n.18 (1969)).

Second, the vessel owner's turnover duty "extends to warning the stevedore of hazards with respect to [ ] equipment known to the vessel that would likely be encountered by the stevedore and would not be obvious to him." *Moore*, 353 F.3d at 381. This duty to warn is a "narrow one": it "attaches only to latent hazards, defined as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work," and it "encompasses only those hazards that are known to the vessel or should be known to it in the exercise of reasonable care." *Howlett*, 512 U.S. at 105 (internal quotation marks omitted). It "does not include dangers which are either: (1) open and obvious or (2) dangers a reasonably competent stevedore should anticipate encountering." *Kirkley*, 535 F.3d at 392.

"[I]f the shipowner had actual knowledge of a condition which presented an unreasonable danger to a longshoreman and actual knowledge that he could not rely on the stevedore to correct [or avoid] the condition, then the shipowner, not the stevedore, is liable to the longshoreman." *Hernandez v. M/V Rajaan*, 841 F.2d 582, 586 (5th Cir.) (citing *Scindia*, 451 U.S. at 175), *opinion corrected on denial of reh'g*, 848 F.2d 498 (5th Cir. 1988). "If the condition existed from the outset [of cargo operations], the shipowner is charged with actual knowledge of the dangerous condition and has a duty to warn the stevedore and the longshoremen if the defect is hidden." *Id.*

Ford bears the burden of proving by a preponderance of the evidence that Potential Shipping violated its turnover duty. *Cf. Ponce ex rel. Estate of Ponce v. M/V ALTAIR*, 493 F. Supp. 2d 880, 893 (S.D. Tex. 2007); *Crochet v. ABC Ins. Co.*, 777 F. Supp. 498, 504 (W.D. La. 1991). "[M]erely proving that an unsafe condition existed at the time of the accident is insufficient to establish liability." *Hudson v. Schlumberger Tech. Corp.*, 452 Fed. App'x 528, 534 (5th Cir. 2011) (quoting *Treadaway v. Societe Anonyme Louis–Dreyfus*, 894 F.2d 161, 166 (5th Cir.1990). "[T]he defendant has not breached its duty to turn over a safe vessel if the defect causing the injury is open and obvious and one that the longshoreman should have seen." *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1246 (5th Cir. 1997) (quoting *Pimental v. LTD Canadian Pacific Bul*, 965 F.2d 13, 16 (5th Cir. 1992)) (alteration in original). Further, "[i]f the longshoreman knew of the defect, then it is considered open and obvious." *Id.* "That being said, even if a hazard is 'open and obvious,' a vessel owner may still be liable where the employee has no alternative but to work in the unsafe condition or leave the job." *Hudson*, 452 Fed. App'x at 534.

**B.**

After reviewing the evidence admitted at trial, the Court finds that Potential Shipping breached its turnover duty and that this breach was a proximate cause of the injuries to Ford resulting from the incident. *Cf. Moore*, 353 F.3d at 380-83.

**i.**

Kevin Fos ("Fos"), an Associated Terminals superintendent who oversaw Associated Terminals' cargo operations on the ship on the day of the incident, testified that he reviews a vessel's certification and inspection records prior to the use of a

vessel's equipment by the longshoremen. He stated that he relies on the accuracy of such records to ensure that a vessel's equipment is in safe working condition.

With respect to the ship, one of these records—titled "Certificate of Test and Thorough Examination of Lifting Appliances (L.A.2)"—documented the safe working load for the cranes on the ship.[4] The safe working load is the amount of tonnage that a crane can safely lift when in field operation. In this case, the no. 2 crane's safe working load was 30.7 tons.[5]

Another record—titled "Examination of Lifting Appliances"—documented third party inspections of the ship's cranes.[6] Lloyd's Register Classification Society (China) Co., Ltd. ("Lloyd's Register") conducted a five-year inspection of the no. 2 crane on October 30, 2016, and it did not find any defects "affecting [the crane's] safe working condition."[7]

Fos testified that no documents provided to him by the ship's crew, nor anything any member of the crew said to him, indicated any problems with the no. 2 crane. The Court finds his testimony to be credible.

On the day of the incident, Associated Terminal's Larry D. Addison ("Addison") operated the no. 2 crane. Addison testified that he has been a crane operator for 17 years, seven years of which have been with Associated Terminals. According to Fos, Addison is an experienced crane operator.

---

[4] Ex. 34, at 1.
[5] *Id.*
[6] *Id.* at 10.
[7] *Id.*

Addison testified that, prior to using the no. 2 crane, he conducted a visual inspection of the crane. He stated that this inspection is a "critical" function of his job.[8]

Concerning the no. 2 crane's wire rope, Addison stated that he visually examined the wire on the spool, as well as of the visible portion of the wire hanging from the boom. He also stated that, as part of his examination, he lowered the boom of the crane to 45 degrees and then lowered the wire rope to the bottom of the hatch on the ship where the wire coils to be offloaded were stored.

Addison testified that he observed a significant amount of grease on the no. 2 crane's wire rope, but he did not observe any fraying or rusting.[9] He also stated that he did not observe any kinks in the wire rope. According to Addison, the no. 2 crane's wire rope did not look any different than any of the other crane wires that he had inspected. Addison further testified that the no. 2 crane's safe working load—30.7 tons—was written on the crane's side.

In the process of conducting his inspection, Addison completed a checklist.[10] On the checklist, Addison marked "Wire Ropes" as being in "Safe Condition."[11] Addison testified that, if he had observed a "significant amount of rust," then he likely would have noted it on the checklist, as it would indicate a possibility of failure.[12] He

---

[8] R. Doc. No. 126, at 248.
[9] Addison indicated that fraying is an indication that the wire rope has been damaged and may break.
[10] Ex. 2.
[11] *Id.* at 2.
[12] R. Doc. No. 126, at 236.

testified that rust on cranes' wire ropes is not commonly observed, as the wire ropes are usually greased.

Addison then began offloading the wire coils, moving them from the ship to a barge adjacent to the ship. Addison recalled using the crane to offload several loads of wire coils before the incident occurred. He testified that, at some point, the number of wire coils that he was offloading at any one time increased from twelve coils to fourteen coils. Addison further testified that the number of coils attached to the no. 2 crane's spreader bar at the time of the incident was fourteen. However, all other evidence admitted at trial indicates that twelve wire coils were attached to the spreader bar at the time of the incident.[13] The Court finds that the maximum number of coils offloaded at any one time on the day of the incident was twelve.[14]

Addison testified that, with respect to the load that he successfully offloaded immediately prior to the incident, he noticed what he believed to be indications that the no. 2 crane was experiencing strain. In response, Addison asked a fellow Associated Terminals' employee to verify that the load was below the crane's safe working load of 30.7 tons. He received verification that it was and he then continued to work.[15]

---

[13] *See id.* at 30 (testimony of Captain Ronald L. Campana); Ex. 29, at 128 (photograph of the wire coils and spreader taken after the incident); Ex. 40, at 1 (statement by the ship's master).

[14] As such, the Court concludes that Addison is mistaken as to the precise number of coils that he was offloading on that day. The Court notes, however, that it does not find that this conclusion diminishes the credibility of the remainder of Addison's testimony.

[15] The load that the crane was moving at the time of the incident consisted of twelve coils plus the spreader bar, which had a combined weight of 27.1 tons. *See* R. Doc. No. 126, at 31 (testimony of Captain Ronald L. Campana); Ex. 29, at 159 (weight scale

At the time that Addison was moving what would be the no. 2 crane's last load of wire coils that day, Ford was on the barge. Ford testified that, as he noticed the shadow of the load move over the barge, he was in the process of mounting his forklift.

According to Fos, who witnessed the incident, the no. 2 crane's load was stationary over the barge when the crane's wire rope snapped. Addison described the wire rope as becoming "immediately unwound."[16] In Ford's words:

> The cable snapped. That load just came barrelling [sic] down into that barge unlike anything—unlike anything you want to see in life. But the load crashed down into the barge floor. It got dark in there all of a sudden because the dirt—the particles on the floor had been lifted and suspended into the atmosphere upon, you know, that kind of weight from that kind of distance striking the barge floor. So it became dark inside of there immediately.[17]

Ford described the force of the load hitting the barge as equivalent to "dropping a school bus off of Winn-Dixie."[18]

Ford testified that, when the load from the no. 2 crane hit the barge, he was thrown forward into the forklift. Immediately after the incident, Ford reported injuries to his ankle and knee, and he received treatment from Prime Occupational Medicine ("Prime"), "the company's doctor."[19] Then, according to Ford, "later on that day, as time progressed, I started feeling pain in my scrotum as well as my back and in my neck."[20]

## ii.

---

showing 27.1 tons). This weight was more than three tons below the no. 2 crane's safe working load.

[16] R. Doc. No. 126, at 245.

[17] *Id.* at 282.

[18] *Id.* at 283.

[19] *Id.* at 287.

[20] *Id.* at 288.

Captain Ronald L. Campana ("Captain Campana") investigated the incident on behalf of Associated Terminals, arriving on the scene within an hour-and-a-half of the incident. Captain Campana works as a marine surveyor, and he has been representing stevedores in the New Orleans area since 1985.[21] Captain Campana testified that he has investigated crane accidents on vessels about 50-to-100 times during the course of his career. Based on his background and experience, the Court qualified Captain Campana as an expert in marine maintenance, inspection and safety, and marine surveying and casualty inspection.

Captain Campana concluded, "without a doubt," that the wire rope had not been properly maintained.[22] Indeed, he testified that he noticed multiple "telltale indicators that there's a problem" with the no. 2 crane's wire rope.[23]

For one, Captain Campana determined that the ship's crew had not removed hardened grease from the wire rope before rubbing fresh grease on it, which prevented the fresh grease from penetrating the wire rope and lubricating the wire rope's core.[24] According to Captain Campana, the greasing of the wire rope and corresponding lubrication of the inner core is a critical component of wire rope maintenance, because "[y]ou don't want the inner wires [of the rope] to become brittle."[25]

---

[21] As relevant in this case, Captain Campana is employed as a surveyor for Associated Terminals.
[22] R. Doc. No. 126, at 49.
[23] *Id.* at 110-11.
[24] *Id.* at 26, 30.
[25] *Id.* at 27.

Captain Campana also determined that some areas of the wire rope did not have any grease at all.[26] He testified that the amount of rust visible on the outside of the no. 2 crane's wire rope was "unusual."[27] He explained that, "[i]f the wire is properly lubricated, you're not going to find rust" and that "[r]ust is an indication that there's no lubrication, that the corrosive atmosphere of sea managed to get into the steel and start rusting it."[28]

Captain Campana further testified that he "could see a physical reduction" in the diameter of portions of the wire strands—"one of the telltale signs that the wire has been under severe stress."[29] Moreover, he opined that the individual wire strands composing the no. 2 crane's wire rope were brittle and that its center was "totally dry."[30]

Captain Campana testified that he had never seen a wire rope in as poor condition at any other time in his career.[31] He also testified that the ship did not have a spare wire on board, a situation that he had "never seen" in his career as a marine surveyor up to that point.

The Court finds Captain Campana's testimony as to the physical condition of the no. 2 crane's wire rope to be credible. With respect to the issue of rust, the Court recognizes that Captain Campana's testimony regarding visible rust on the no. 2

---

[26] *Id.* at 44-45.
[27] *Id.* at 36.
[28] *Id.* Similary, Don Zemo, a general manager at Associated Terminals who has experience certifying offshore cranes and training crane operators, testified that rust is "an indicator that [a wire rope has] not been lubricated properly." *Id.* at 209.
[29] *Id.* at 77.
[30] *Id.* at 146.
[31] *Id.* at 56.

crane's wire rope appears in conflict with other testimony offered at trial. Specifically, based on the checklist that he completed before using the no. 2 crane on May 29, 2017,[32] Addison testified that he "didn't basically see any rust" on the no. 2 crane's wire rope during his inspection of the crane, which included a visual inspection of the wire rope on the crane's spool and the portion of the wire rope that became visible upon lowering the boom into the ship's hatch.[33]

However, Addison's testimony does not necessarily conflict with the testimony offered by Captain Campana. It is possible that the rust visible to Captain Campana during his post-incident inspection was not visible to Addison. In other words, Addison and Captain Campana may simply be describing different portions of the no. 2 crane's wire rope.

In any event, Captain Campana substantiated his testimony by reference to a post-incident photograph of the wire rope.[34] The Court finds Captain Campana's description of the degree of rust on the wire rope to be more convincing.

### iii.

Evidence admitted at trial also showed that the no. 2 crane's wire rope dated to 2011.[35] Captain Campana testified that "[m]ost manufacturers" recommend replacing wire ropes on ship-mounted cranes at least every four years, assuming

---

[32] *See* Ex. 2.

[33] R. Doc. No. 126, at 236; *see also id.* at 234-35.

[34] *See id.* at 35-36 (interpreting Ex. 29, at 178).

[35] *See* Ex. 31, at 1 ("Certificate for Steel Wire Rope," dated March 30, 2011); *id.* at 3 ("Mill Test Certificate," dated May 26, 2011).

"normal usage" and proper maintenance.[36] According to Captain Campana, this four-year lifetime is the "industry standard."[37]

Captain Campana was unfamiliar with the usage history of the no. 2 crane's wire rope.[38] Further, when asked about the manufacturer's recommendation for the wire rope at issue in this case, Captain Campana testified that he has "seen this manufacturer's website" and that the website listed the wire rope's recommended lifetime as four years.[39] However, Captain Campana could not remember the name of the manufacturer until prompted by the Court to look at Exhibit 31, which lists the manufacturer as Kiswire Ltd.[40]

In addition to Captain Campana, however, Don Zemo ("Zemo")—a general manager at Associated Terminals who had previously been employed at Link-Belt Cranes for about 18 years, and who has experience certifying offshore cranes and training crane operators—offered testimony regarding wire rope manufacturers' recommendations as to the working life of such wire ropes. Zemo testified that every wire rope manufacturer with which he is familiar recommends replacement at least every four years.[41] When asked by the Court whether a wire rope could ever reasonably be used beyond four years, depending on usage, Zemo explained:

---

[36] R. Doc. No. 126, at 25, 35. Captain Campana noted that he did not examine the ship's maintenance records during his inspection.
[37] *Id.* at 66.
[38] *Id.* at 99. The Court finds that no credible and/or convincing evidence was admitted at trial with respect to the usage history of the no. 2 crane's wire rope. The Court also finds that no credible and/or convincing evidence was admitted at trial with respect to the maintenance history of the same.
[39] *Id.* at 65-66.
[40] *Id.* at 63, 68.
[41] *Id.* at 199.

> There are ways to inspect a cable, but you have to open them up to inspect the inside. There's two parts to a cable. There's the outer strands and then there's the inner core. So you cannot see the inner core. So the only way you can do it is either cut a piece off and get it pull tested or you can actually open it up and look at it. But all manufacturers recommend no more than four years.[42]

He further testified that this four-year recommendation does not turn on usage.[43] The Court accepts Zemo's testimony on this point to be credible.

### iv.

With respect to any negligence on the part of Associated Terminals, Captain Campana determined that the longshoremen did not exceed the no. 2 crane's safe working load. Further, Zemo testified that Associated Terminals' policy limiting the use of cranes to 33% of the safe working load did not apply to the no. 2 crane in this case and, therefore, the longshoremen could use the crane up to lift capacity.

Fos testified that, if an Associated Terminals crane operator experiences strain—*i.e.*, if the crane is having trouble lifting a load—then the operator should advise the foreman and/or the supervisor. Fos stated that Addison never reported any strain with the no. 2 crane.

Yet Zemo—who, again, has experience certifying offshore cranes and training crane operators—testified that some amount of strain on a crane is not necessarily problematic. Further, Addison testified that, upon noticing what he believed to be signals that the no. 2 crane was experiencing strain, he took steps to confirm that the size of the loads that he was moving from the ship to the barge did not exceed the safe working load. Specifically, he asked a fellow Associated Terminals' employee to verify

---

[42] *Id.*
[43] *Id.* at 200.

that the load was below the crane's capacity. He received verification that it was and he then continued to work.

Based on this evidence, the Court concludes that Addison's conduct on the day of the incident was reasonable under the circumstances.

**v.**

With respect to the effect of classification society[44] certification on Potential Shipping's liability, Captain Campana testified that Lloyd's Register is the classification society for the ship. He noted that Lloyd's Register has an "excellent reputation."[45]

Evidence indicates that, prior to the incident, Lloyd's Register last inspected the no. 2 crane on October 30, 2016.[46] At the time, a representative from Lloyd's Register certified that "no defects affecting [the] safe working condition [of the no. 2 crane] were found."[47]

The Fifth Circuit has recognized that "[t]he societies' surveys and certificate system are essential to maintaining the safety of maritime commerce, yet their

---

[44] "Classification societies are organized societies which undertake to arrange inspections and advise on the hull and machinery of a vessel from its initial stages in new building and thereafter. The societies produce a certificate concerning the vessel's seaworthiness in accordance to the trade within which it is intended to, or does, work." *Otto Candies, L.L.C. v. Nippon Kaiji Kyokai Corp.*, 346 F.3d 530, 533 (5th Cir. 2003) (quoting Damien L. O'Brien, *The Potential Liability of Classification Societies to Marine Insurers Under United States Law*, 7 U.S.F. Mar. L.J. 403, 403 (1995)) (internal quotation marks omitted). "Before a classification society issues a class certificate free of recommendations, it must be satisfied that the certified vessel complies with the society's rules and standards for ships of the relevant class." *Id.* at 537 (citing Machale A. Miller, *Liability of Classification Societies from the Perspective of United States Law*, 22 Tul. Mar. L.J. 75, 77-81 (1997)).
[45] R. Doc. No. 126, at 70.
[46] Ex. 34, at 10.
[47] *Id.*

activities should not derogate from shipowners' and charterers' *nondelegable duty* to maintain seaworthy vessels." *Otto Candies, L.L.C. v. Nippon Kaiji Kyokai Corp.*, 346 F.3d 530, 535 (5th Cir. 2003); *see also Vloeibare Pret Ltd. v. Lloyd's Register N. Am., Inc.*, 606 Fed. App'x 782, 784 (5th Cir. 2015) (noting the Fifth Circuit's position that "shipowners generally have the final responsibility to ensure that a vessel is seaworthy"). Thus, the Court concludes that certification by Lloyd's Register is not conclusive of Potential Shipping's liability under § 905(b).

Indeed, in this case there is no indication that Lloyd's Register, when its representative inspected the ship in 2016, considered whether the fact that the no. 2 crane's wire rope had been in use for over four years created a hazard. In light of Zemo's credible testimony as to why wire rope manufacturers universally recommend wire rope replacement at least every four years, the Court does not find Lloyd's Register's 2016 inspection of the ship to be particularly probative. The condition of the no. 2 crane's wire rope resulted in a proverbial accident waiting to happen—one that came to fruition on May 19, 2017.

### vi.

Based on the evidence admitted at trial, the Court finds that the no. 2 crane was in a defective condition at the outset of Associated Terminals' cargo operations on May 19, 2017 due to the condition of its wire rope, in particular the wire rope's core. The Court also finds that the no. 2 crane's defective condition was not open and obvious, and that a reasonable and experienced longshoreman would not have noticed it. The Court thus concludes that Potential Shipping breached its turnover duty.

Further, the Court finds that the breach was a proximate cause of Ford's injuries resulting from being thrown forward into the forklift when the load from the no. 2 crane hit the barge on which Ford was working. Therefore, Ford is entitled to damages to compensate him for these injuries.

It is to the determination of Ford's damages that the Court now turns.

## II.

### A.

"When Congress enacted section 905(b), it neither limited the available remedies, nor created a new or broader admiralty remedy." *Rutherford v. Mallard Bay Drilling L.L.C.*, No. 99-3689, 2000 WL 805230, at *2 (E.D. La. June 21, 2000) (Vance, J.). "Rather, it 'merely preserve[d] an injured worker's right to recover damages from third parties in accordance with nonstatutory negligence principles.'" *Id.* (quoting *Parker v. South La. Contractors, Inc.*, 537 F.2d 113, 118 (5th Cir. 1976)) (alteration in original).

In other words, "[a] plaintiff's right to damages for negligence pursuant to the LHWCA section 905(b) arises under the general maritime law." *Lucas v. Terral Riverservice, Inc.*, No. 01-0704, 2002 WL 1822934, at *2 (E.D. La. Aug. 8, 2002) (Livaudais, J.); *see also Stevenson v. Point Marine, Inc.*, 697 F. Supp. 285, 288 (E.D. La. 1988) (Beer, J.) ("In the LHWCA context, a longshoreman's action against a vessel owner for negligence arises under the general maritime law—not under the LHWCA, 33 U.S.C. § 905(b). This is well-settled."). As such,

> [i]n actions brought under § 905(b), an injured LHWCA covered employee may recover those items of damages which are recoverable under the general maritime law, including monetary recovery for past and future loss of earning capacity and wages, past and future medical

18

expenses, and pain and suffering resulting from an injury caused by the defendant's negligence.

*Baham v. Nabors Drilling USA, LP*, 721 F. Supp. 2d 499, 516 (W.D. La. 2010), *aff'd sub nom. Baham v. Nabors Offshore Corp.*, 449 Fed. App'x 334 (5th Cir. 2011) (per curiam); *cf. Daigle v. L & L Marine Trans. Co.*, 322 F. Supp. 2d 717, 730 (E.D. La. 2004) (Fallon, J.) ("Under the Jones Act and general maritime law, monetary recovery is allowed for loss of earning capacity, medical expenses, and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness.").

"Past lost wages are usually measured by the actual wage losses incurred by the plaintiff from the date of the accident to the date of trial." *Baham*, 721 F. Supp. 2d at 516 (citing Thomas J. Schoenbaum, Admiralty and Maritime Law, § 5-15.1 (4th ed. 2004)). "The sum is determined by calculating the amount of money the plaintiff would have earned had he continued at his pre-accident employment, less any wages he earned since the accident." *Id.* (citing *Blaauw v. Superior Offshore International, LLC*, No. 05-1380, 2008 WL 4224808, at *17 (W.D. La. Sept. 10, 2008) (Hill, M.J.)). A court should also subtract "any wages that [a plaintiff] could have earned despite his physical condition." *Ledet v. Smith Marine Towing Corp.*, No. 10-1713, 2011 WL 1303918, at *12 (E.D. La. Apr. 4, 2011) (Vance, J.), *aff'd*, 455 Fed. App'x 417 (5th Cir. 2011) (per curiam). "In the maritime context, an award for lost wages must be based on after-tax earnings." *Id.*

"An award for impaired earning capacity is intended to compensate the worker for the diminution in that stream of income." *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 533 (1983); *see also Treadaway v. Societe Anonyme Louis-Dreyfus*, 894 F.2d 161, 169 (5th Cir. 1990) (quoting *Jones & Laughlin Steel Corp.* in a § 905(b)

case).  "The paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned."  *Martinez v. Offshore Specialty Fabricators, Inc.*, 481 Fed. App'x 942, 949 (5th Cir. 2012) (quoting *Culver v. Slater Boat Co.*, 722 F.2d 114, 120 (5th Cir.1983) (en banc), *abrogated on other grounds by Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330 (1988)).

"In calculating damages for [future lost wages], it is assumed that if the injured party had not been disabled, he would have continued to work, and to receive wages at periodic intervals until retirement, disability, or death."  *Jones & Laughlin Steel Corp.*, 462 U.S. at 533.  "The base figure used to calculate future wage loss is the difference between what a person could have earned 'but for' the accident and what he is able to earn upon returning to work in his partially disabled state."  *Masinter v. Tenneco Oil Co.*, 867 F.2d 892, 899 (5th Cir. 1989), *mandate recalled & modified*, 934 F.2d 67 (5th Cir. 1991); *see also Culver*, 722 F.2d at 117 (explaining that the first three steps in calculating an award for future lost wages are "estimating the loss of work life resulting from the injury or death, calculating the lost income stream, [and] computing the total damage").  This difference between an individual's pre- and post-accident earning capacity should account for "income incidental to work, such as fringe benefits," as well as "income tax and work expenses."  *Id.*; *see also Baham*, 721 F. Supp. 2d at 515 ("Future lost income must be computed on net after-tax value.").  Finally, a court must discount this difference to present value.  *Daigle*, 322 F. Supp. 2d at 731.

The Court may also award damages for lost household services. *See, e.g.*, *Ponce*, 493 F. Supp. 2d at 888-89 (summarizing evidence concerning lost household services). To do so, the record must contain evidence of the household services that a person performed prior to sustaining his injury, as well as evidence that the person can no longer perform those services.[48] *Cf. Hernandez*, 841 F.2d at 590 ("[T]he trial court is not at liberty to grant damages for lost household services in the absence of any evidence that Hernandez performed household services in the past.").

Courts calculate past medical expenses based on the amounts actually expended for medical care. *See, e.g.*, *Koch v. United States*, No. 13-205, 2015 WL

---

[48] The only person to offer testimony as to the value of Ford's lost household services was Dr. Todd D. Cowen, who prepared a life care plan on behalf of Ford. Dr. Cowen explained:

> So whenever we do a life care plan, we also have to take into account those functions that a person would normally do for themselves that they may not be able to do anymore. In this case—well, let me back up. So that would include things like mowing the lawn, weed eating, car maintenance, heavy home cleaning, cleaning gutters, picking up branches. [Ford] indicated to me he was unable to mow his lawn, which is certainly reasonable, and he was paying somebody about $40 to do so. I chose a conservative $120 per month to cover that. That doesn't take into account all those other items I just listed.

R. Doc. No. 127, at 186-87. Ultimately, Dr. Cowen valued Ford's total lost household services at "about $1,200, $1,300 a year." *Id.* at 187. Dr. Cowen did not delineate the components of this total in his testimony.

The Court finds that Ford has not met his burden of proving the value of his lost household services by a preponderance of the evidence. With the exception of Dr. Cowen's testimony concerning Ford's lawn care, no witness—Ford included—offered testimony concerning household services that Ford performed prior to his injury, household services that Ford is now allegedly unable to perform, or the cost to Ford of those lost household services. Further, with respect to Ford's lawn care, Dr. Cowen's testimony does not establish how often Ford in fact has his lawn mowed. Without testimony or other evidence to this effect, Ford has not sustained his burden of proof with respect to lost household services.

4129312, at *7 (E.D. La. July 7, 2015) (Morgan, J.), *aff'd*, 857 F.3d 267 (5th Cir. 2017). After all, "agreed-upon past expenses can be readily calculated," and the Court can then assess whether those expenses reflect the usual and customary charges in a given market for the care received. *Id.* n.48 (quoting *Tucker v. Cascade Gen., Inc.*, No. 09-1491, 2014 WL 6085829, at *27 (D. Or. Nov. 13, 2014) (Acosta, M.J.)).

With respect to future medical expenses, courts only award damages for such expenses when it is reasonably likely that a plaintiff will incur them in the future. *Cf. Ledet*, 2011 WL 1303918, at *15 ("As to future medical expenses, Dr. Ulm testified that, at this point, the most likely treatment for Ledet would be an implantable pain pump. . . . [H]owever, the Court finds its too speculative that Ledet will, in fact, have the pain pump installed."). Further, as with awards for future lost wages, awards for future medical expenses are discounted to present value. *See id.*

"An award for pain and suffering may include a sum for mental anguish and physical discomfort, and for the mental and physical effects of the injury on the plaintiff's ability to engage in those activities which normally contribute to the enjoyment of life." *Baham*, 721 F. Supp. 2d at 515 (citing Thomas J. Schoenbaum, Admiralty and Maritime Law, § 5-15.3 (4th ed. 2004)). "Damages for pain and suffering are not subject to precise measurement." *Id.* "[A]ny amount awarded for pain and suffering depends to a great extent on the trial court's observation of the plaintiff and its subjective determination of the amount needed to achieve full compensation." *Hyde v. Chevron U.S.A., Inc.*, 697 F.2d 614, 632 (5th Cir.1983). "Each award for pain and suffering depends heavily on its own facts." *Hernandez*, 841 F.2d at 590.

As with liability, Ford carries the burden of proving his damages by a preponderance of the evidence.  *See Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1088 (5th Cir. 1982) ("The plaintiff bears the burden of proof to show the amount, as well as the fact, of damages.").  Such damages must be more than "speculative or purely conjectural" to justify a court's award.  *Masinter v. Tenneco Oil Co.*, 929 F.2d 191, 194 (5th Cir. 1991).

### B.

### i.

As the Court previously explained, Ford testified that, when the load from the no. 2 crane hit the barge, he was thrown forward into the forklift.  Immediately after the incident, Ford reported injuries to his ankle and knee, and he received treatment from Prime, "the company's doctor."[49]  Then, according to Ford, "later on that day, as time progressed, I started feeling pain in my scrotum as well as my back and in my neck."[50]

Evidence admitted at trial shows that Ford's ankle and knee pain dissipated within a week of the incident.[51]  Further, Ford agreed on cross-examination that the pain in his scrotum dissipated "fairly quickly" after the incident.[52]

From the day of the incident until June 9, 2017, Ford received treatment from Prime for injuries stemming from the incident.  Ford also visited the emergency room

---

[49] R. Doc. No. 126, at 287.
[50] *Id.* at 288.
[51] Ex. 19, at 49.
[52] R. Doc. No. 126, at 341.

at Ochsner Medical Center–West Bank Campus on one occasion during such time period, complaining of testicular pain.

Then, on June 9, 2017, Ford ended his treatment with Prime. According to a Prime clinical note bearing that date: "Physical exam abruptly ended at patient's request and against medical advice. Stated he just wants a copy of his medical records and wants to go."[53]

On June 10, 2017, Ford began treatment with Dr. William A. Brennan, a neurosurgeon based in Lafayette, Louisiana. Ford has since been treated by Dr. Brennan.

According to Ford, he learned of Dr. Brennan from a list of recommended physicians provided to him by his counsel in this case. Ford has never made an effort to locate a treating physician in the New Orleans area, where he lives.[54] Ford testified that, instead, he drives two hours each way to Lafayette for his appointments with Dr. Brennan.

Between the accident and July 21, 2017, Ford continued to work for Associated Terminals. However, on July 21, 2017, Ford reported to Dr. Brennan over the telephone that "his job is worsening his pain."[55] Dr. Brennan then "excused" Ford "from work for medical reasons until further notice."[56] Ford has not yet reentered the workforce.

---

[53] Ex. 19, at 52.
[54] Ford lives in Gretna, Louisiana. *See* Ex. 16, at 2 (January 4, 2018 invoice listing Ford's address).
[55] Ex. 13, at 29.
[56] *Id.*, p. 31.

Dr. Brennan testified that, after beginning his treatment of Ford, he "ordered an MRI scan of the cervical, thoracic and lumbar spine, the areas that were bothering [Ford]."[57] An open MRI was performed on Ford on June 30, 2017.[58] According to Dr. Brennan, this MRI resulted in a low-quality image that was "insufficient for surgical decision making."[59] However, Dr. Brennan was able to draw some conclusions from the MRI:

> I thought there was potential for a pain generator in the disc of the cervical spine. I did not feel that way about the thoracic or the lumbar, especially whether I could make any positive impact in his care by suggesting surgery in either of those two other locations.[60]

Dr. Brennan subsequently ordered a second MRI of the cervical spine. Between the two MRIs, Dr. Brennan treated Ford's pain with physical therapy.[61] Ford's last appointment for physical therapy was December 22, 2017. Ford testified that "[p]hysical therapy did help while I was treating"—which the physical therapy records in evidence themselves show[62]—but Ford "found that [physical therapy] got to be a bit extreme" and so he "backed off" of it.[63] Ford did testify, however, that he

---

[57] R. Doc. No. 127, at 21.

[58] *See* Ex. 17, at 3-6 (radiologist's cervical findings), 7-9 (radiologist's thoracic findings), 10-11 (radiologist's lumbar findings).

[59] R. Doc. No. 127, at 90.

[60] *Id.* at 26.

[61] *See* Ex. 25.

[62] The Court acknowledges that legitimate questions were raised at trial as to apparent inconsistences within these records. Moreover, no Xtreme Physical Therapy employee testified at trial, and no explanation for these apparent inconsistences was offered to the Court. Therefore, out of an abundance of caution, the Court will not rely on these records when determining appropriate damages for Ford.

[63] R. Doc. No. 126, at 367.

would "go to physical therapy if that's what . . . Dr. Brennan recommends and that's what [is] necessary."[64]

Dr. Brennan has also been treating Ford with medication. However, Ford testified that he is "strongly against taking medicine," because he believes that "prescription drugs turned [his] brother into a dope addict."[65] Indeed, Ford indicated that, since beginning his treatment with Dr. Brennan, he has at least once gone months without taking any medication, including over-the-counter medication.

Ford's second MRI was conducted on December 18, 2017.[66] Dr. Brennan testified that the MRI resulted in a higher quality image than the June 30, 2017 MRI.

With respect to this second cervical MRI, the radiologist who examined the resulting image found "[s]pondylotic changes anteriorly and posteriorly at the C5-6 level with a diffuse disc herniation/protrusion posteriorly and narrowing of the central spinal canal as well as severe narrowing of the neural foramen on the left and moderate narrowing the neural foramen on the right."[67] The radiologist also found "annular disc bulges posteriorly" at multiple levels, including the C4-5 and C6-7 levels.[68]

Dr. Brennan offered an alternative interpretation of the image produced by the second cervical MRI. To Dr. Brennan, the image shows that Ford has a disc herniation at the C5-6 level, as well as at the C4-5 and C6-7 levels.[69]

---

[64] *Id.* at 371.
[65] *Id.* at 308-09.
[66] Ex. 21, at 14-15 (radiologist's findings).
[67] *Id.* at 15.
[68] *Id.*
[69] R. Doc. No. 127, at 50. Dr. Brennan explained his divergence from the radiologist vis-à-vis the labeling of the C4-5 and C6-7 level disc abnormalities as follows:

In contrast to both the radiologist and Dr. Brennan, Dr. Henry L. Eiserloh, the orthopedic surgeon who conducted an independent medical evaluation of Ford on behalf of Potential Shipping, did not identify any abnormalities in Ford's cervical spine to which he would attach the label "herniation." Dr. Eiserloh explained that, in his view, "Ford does have a capacious spinal canal with disc bulges or extension of disc material in a broad-based fashion from that C3-4, C4-5, C5-6, and C6-7," but "it's not acute—acute herniation type disc herni—disc bulges."[70]

Dr. Brennan recommends that Ford undergo a three-level anterior cervical discectomy and fusion.[71] Ford has not yet scheduled any surgery.

---

Remember, the radiologist isn't about to do surgery on them, but I'm looking at it from the standpoint of, number 1, what's the pain generator; number 2, what's the consequence of me doing the surgery to the rest of the cervical spine. So that's why I felt that the other levels, 4-5 above and 6-7 below were abnormal and bulging/herniated enough that they should be included for fear of fusing 5-6 and setting off a chain reaction in a short period of time, maybe months of coming back to the operating room to do more surgeries.

*Id.* at 42-43.

Dr. Brennan was questioned at length regarding the distinction between a herniation and a bulge. *See id.* at 42-47. He testified that "[t]here isn't any radiology definition of herniation," explaining that "[i]t's basically gestalt." *Id.* at 43. According to Dr. Brennan, "if you think about a ten point scale, every radiologist would say a ten is herniated and a one is bulging, every single radiologist, every neurosurgeon." *Id.* at 45. The point spread between five and seven is where there is less agreement. *See id.* at 45-46.

However, Dr. Brennan testified that "the word herniation in a radiology report has high positive predictive value," meaning that, "if [a radiologist] says there's a herniation there, you can bet that's an abnormal disc." *Id.* at 46. In other words, if a radiologist labels a disc abnormality to be a herniation as opposed to a bulge, then the problem is more severe. *Id.* Of course, a disc level that a radiologist defines as a bulge, not a herniation, may still be symptomatic. *Id.*

[70] Ex. 73, at 30.

[71] The Court notes that Dr. Brennan testified that, if Ford undergoes this surgery, then it will be more likely than not that Ford will require a second surgery within

## ii.

After carefully considering the evidence admitted at trial, the Court finds that Ford has one herniated disc, at the C5-6 level, which was proximately caused by the incident. The Court further finds that Ford has experienced, and continues to experience, pain stemming from disc abnormalities caused or exaggerated by the incident, regardless of the labels attached to those abnormalities.[72]

The following damages awarded by the Court reflect these findings.

## iii.

With respect to Ford's past medical expenses attributable to the incident, the parties stipulated on the record that Ford's past medical expenses total $17,075.45.[73] Potential Shipping has never suggested that the care that Ford received up to the date of trial was unreasonable, or that the charges for that care exceeded the usual and customary cost for such care in Louisiana. Given the parties' stipulation, the Court will award **$17,075.45** to Ford for his past medical expenses.

## iv.

With respect to Ford's past lost wages attributable to the incident, Dr. Kenneth G. McCoin—who the Court qualified as an expert in economics—testified that Ford was earning $16 per hour at the time that Dr. Brennan excused Ford from work on

---

two decades—and possibly even a third surgery within two decades after that. R. Doc. No. 127, at 59, 142-44.

[72] The Court places significant weight on the opinion of the radiologist, the only medical professional not employed in this litigation to opine on the image produced by Ford's second MRI. In the Court's view, the radiologist offered the most objective analysis of this image.

[73] R. Doc. No. 127, at 4.

July 21, 2017.[74]  Dr. McCoin's figure is supported by Ford's payroll records.[75]  Dr. McCoin then explained how he calculated Ford's past lost wages, measured from July 21, 2017—the date on which Dr. Brennan excused Ford from work—to the trial date of February 20, 2018:

> The steps are that his annual wage at $16 an hour is $33,280, which is about his three-year average wage rate and project that forward annually until we get to the present date.  The lapse of time since that started was 0.417 years.  And if you add up just his nominal wages over that period of time, it's about $19,624.  But if you apply a work life statistic taking into account the likelihood he would earn those wages, which is about 71 percent for him on average, his effective wages are $13,958. With that, you would associate some fringe benefits at the statutory normal rate, 18 percent, less work cost, less Social Security, state and federal income taxes.

Dr. McCoin then concluded that Ford's past lost wages totaled $13,788.[76]

The Court finds that Dr. McCoin's methodology is credible and that $13,788 is a reasonable calculation of the wages that Ford would have earned if he had continued to work as a forklift operator at Associated Terminals between July 21, 2017 and the date of trial.  The Court also finds that, as of July 21, 2017, Ford's pain attributable to the incident prevented him from continuing to work in that capacity.

However, based on the testimony and other evidence admitted at trial, as well as its own observations of Ford, the Court finds that Ford's pain does not prevent him from performing all work.  In fact, even Dr. Brennan testified that "[a]nything in the sedentary or light category [of work] he can try safely."[77]  Given its finding that Ford

---

[74] *Id.* at 277.
[75] *See* Ex. 46, at 166 (Ford's payroll record for period beginning July 10, 2017 and ending July 16, 2017).
[76] R. Doc. No. 127, at 278; *see also* Ex. 72.
[77] R. Doc. No. 127, at 70.

is not incapable of working, the Court must consider whether to reduce $13,788 by some amount due to a failure on Ford's part to try to mitigate his damages. This is a difficult question.

Ford testified that, since leaving Associated Terminals on July 21, 2017, he has never attempted to find work of any kind.[78] Some of Ford's testimony suggests that it is Ford's pride, not his pain, that has been a barrier to Ford trying to obtain other work: Ford appears to have certain baseline standards for the type of work that he is willing to do. The following exchange between Ford and defense counsel illustrates the point:

> Q. Okay. But you never talked with Dr. Brennan about whether you would be capable of doing some other type of less demanding job, have you?
>
> A. I talked to Dr. Brennan about getting my body back to where it should be and the concern that I have with my body being able to—whether or not my body would actually be able to be where I think it needs to be to provide a decent, at least in my eyes, a decent lifestyle for my family. Not just going to jump into some oddball, you know, job just to say, yeah, I went to work. You know, I got injured and I went back to work somewhere. My concern has really been with Dr. Brennan, that is how soon do you think I'll get back to normal, if ever, and what are my chances of getting back to normal so that I can get out and work a job other than a cash register.[79]

Yet the Court does recognize that Dr. Brennan wrote Ford a prescription on July 21, 2017 that excused Ford "from work for medical reasons until further notice."[80] This prescription was written against the backdrop of Ford's job as an Associated Terminals' forklift operator.

---

[78] R. Doc. No. 126, at 358.
[79] *Id.* at 359; *see also id.* at 362-63.
[80] Ex. 13, at 31.

Ford appears to believe that such prescription meant that he could not reenter the workforce in any capacity until Dr. Brennan gave him permission to do so. Dr. Brennan's testimony corroborates Ford's understanding as to the prescription's scope:

> THE COURT: For instance, I'm not saying he's capable of doing this or not capable of doing this. I haven't heard from the vocational rehab expert yet. But, for instance, suppose he wanted to do a job as a salesperson. You wouldn't restrict him from doing that, would you?
>
> DR. BRENNAN: Anything in the sedentary or light category he can try safely. As his physician, I don't think he's going to injure himself. How he—how he can go forward doing it I guess is just a subject of finding out.
>
> THE COURT: Have you told him that, that he's not restricted in those capacities according to you at this point?
>
> DR. BRENNAN: He's restricted in that capacity right now because we're trying to make a surgical decision. If in March he tells me I want to go forward, I don't want any more appointments with you, I'm going to just see what life brings me, I'm going to tell him, please don't do anything heavier than light work.
>
> THE COURT: So you're waiting to see what his decision is before you suggest light or sedentary work?
>
> DR. BRENNAN: That's correct.[81]

The Court thus finds that it was reasonable for Ford to not attempt to obtain other work up to the date of trial, and it will award Ford **$13,788** for past lost wages.

### v.

With respect to Ford's future medical expenses attributable to the incident, Dr. Todd D. Cowen—who the Court qualified as an expert in physical medicine rehabilitation, pain management, and life care planning—testified as to the life care

---

[81] R. Doc. No. 127, at 70-71.

plan that he prepared for Ford. Dr. Cowen explained his methodology for preparing the life care plan as follows:

> Begins with taking a set of intake facts, the facts being those garnered from the medical records, those gained from doing the physical examination, taking that information and then formulating diagnostic conclusions or, basically, what's wrong with the individual. From there, taking all of that, formulating opinions on probable future medical care, and then forming research to find out what that care would likely cost.[82]

Dr. Cowen then explained the life care plan that he had developed for Ford.

After Dr. Cowen finished testifying, Dr. William Davenport—who the Court qualified as an expert in the field of financial analysis, with an emphasis on present value—testified as to the present value of the life care plan developed by Dr. Cowen. He concluded that the present value of the life care plan was as follows: physician services, $60,140; routine diagnostics, $32,666; medications, $96,323; rehabilitation services, $67,152; equipment and supplies, $2,044; environmental modifications and essential services, $70,573; and acute care services, $158,753.[83] Thus, the total present value of Dr. Cowen's life care plan for Ford is $487,651.[84]

The Court, however, may not need to opine as to whether it finds Dr. Cowen's methodology to be credible, or whether his conclusions as to the care that Ford will require in the future are reasonable and reasonably certain. This is because Dr. Cowen's life care plan, as Dr. Cowen stated at trial, "is based on the projection that [Ford] has the surgery" that Dr. Brennan recommends—namely, a three-level

---

[82] *Id.* at 174.
[83] *Id.* at 256-57.
[84] *Id.* at 257. Dr. Davenport testified that the total present value of the life care plan was $487,659. *Id.* After adding up the numbers itself, the Court concludes that Dr. Davenport's arithmetic was incorrect.

cervical fusion.[85]  If the Court finds that Ford will not pursue that surgery in the future, then Dr. Cowen's life care plan is simply not relevant, at it is built on a faulty premise.

First, based on the testimony and other evidence admitted at trial, the Court has significant doubts about whether this proposed surgery is an appropriate course of treatment for Ford at this point.  Dr. Brennan's recommended course of treatment in this case is a three-level fusion on a man in his mid-30s with a herniated disc.[86]  Dr. Eiserloh opined that it would be a "disservice" to Ford to perform such a procedure, as it was simply "not necessary today."[87]

With respect to alternatives to surgery, Ford completed physical therapy on December 22, 2017, and Dr. Brennan has not prescribed additional physical therapy since that time.[88]  Moreover, Dr. Brennan testified that he is "not a big fan of the cervical epidural injections because of the paralysis risk."[89]  Dr. Cowen later testified that he was "a little surprised" to learn of Dr. Brennan's opposition to epidural steroid injections.[90]

Dr. Cowen further testified that it would be reasonable for Ford to have an epidural steroid injection in his cervical spine before pursuing surgery.[91]  According

---

[85] *Id.* at 215.

[86] Dr. Eiserloh testified that, in his opinion, Dr. Brennan was "a little more aggressive than most" physicians.  Ex. 73, at 76.

[87] *Id.* at 38, 87.

[88] Ex. 25, at 99; R. Doc. No. 127, at 128.

[89] *Id.* at 67.  Indeed, Dr. Brennan testified that he refused to order them, based on a belief that he would be liable if such injections—which would presumably not be done by him—led to paralysis.  *Id.* at 137.  He further testified that, "in this country, about 12 people a year are made permanently quadriplegic by" these injections.  *Id.* at 75.

[90] *Id.* at 219.

[91] *Id.* at 212-13.

to Dr. Cowen, "[t]he purpose [of such an injection] is to decrease inflammation and swelling around nerve roots around the disc to help decrease pain."[92]  In fact, upon questioning from the Court, Dr. Cowen confirmed that some patients who receive epidural steroid injections may progress to the point where surgical intervention is unnecessary to manage their pain.[93]  On this issue, the Court finds Dr. Cowen's testimony to be credible.

Yet whether Dr. Brennan's suggestion for surgery in this case[94] is appropriate is ultimately secondary to the more significant issue facing the Court: Ford has not met his burden of proving by a preponderance of the evidence that he will pursue this surgery in the future, even if the Court found that doing so would be reasonable and justified.

Ford told Dr. Brennan on January 4, 2018—the date of Ford's most recent appointment with Dr. Brennan—that he was "not certain as to whether his pain level, which he considers moderate, is sufficient enough for surgery at this time."[95]  At trial, while Ford testified at one point that he has not decided not to have the surgery and he was "not going to refuse any kind of treatment at this point,"[96] he *never* testified that he had decided to *have* the surgery.  Indeed, upon questioning from the Court, Ford confirmed that no surgery has been scheduled.[97]

---

[92] *Id.* at 213.
[93] *Id.* at 220.
[94] According to Dr. Brennan, "in Louisiana, the nine years I've been here, the 900 surgeries I've done on the cervical spine, I've had zero failures."  *Id.* at 146.  The term "failure," as used by Dr. Brennan, was not defined at trial.
[95] Ex. 15, at 1.
[96] R. Doc. No. 126, at 370-71.
[97] *Id.* at 371.

Ford testified that the surgery recommended by Dr. Brennan is "inevitable."[98] According to Ford, "I know that surgery is in my future, because I trust Dr. Brennan has been doing this long enough and knows what he's saying."[99] In short, Ford's belief that surgery is unavoidable is based on the opinion of Dr. Brennan.

However, Dr. Brennan has never indicated that Ford's surgery was, as Ford suggested, inevitable. On a January 4, 2018 patient record, Dr. Brennan indicated that he "firmly believe[s] that in the next 5 years, it is more likely than not that [Ford] is going to *select* surgery to treat [his] problem."[100] At trial, the Court questioned Dr. Brennan about this belief:

> THE COURT: How did you come up with the five-year figure?
>
> DR. BRENNAN: Well, it's just my experience that that—because I've been in Louisiana nine years that I've given nonsurgical management to at least several hundred patients and they've sometimes come back. If they're going to come back, they're going to come back inside of five years.
>
> This is a surgical problem that's not going away. If somebody comes and sees me three weeks after an accident, they have a syndrome. It goes away. The next time I see them six weeks later, I'm like, well, you may not—you may not be somebody who needs to have surgery.
>
> If something goes on for six to eight months continuously and there's an anatomic correlate to it, that person's going to get tired of it. It may not—it may not bring them down from a neurosurgical standpoint with arm weakness, leg weakness, paralysis and those kind of things, but the patients are just going to get generally tired of treating and seek surgical recommendation. Most of the people I operate on have had a syndrome less than five years.
>
> THE COURT: So it's based on the anatomical study such as the MRI, based on your experience, and the plaintiff's or the litigant's complaints; is that right?

---

[98] *Id.* at 330.
[99] *Id.* at 331.
[100] Ex. 15, at 1 (emphasis added).

DR. BRENNAN: *Just the nature of patients.* They just simply won't tolerate year after year after year of doing this type of treatment.[101]

In short, Dr. Brennan's belief that Ford will choose surgery within the next five years, which is the basis for Ford's own belief that surgery at some indeterminate point in the future is inevitable, is premised on Dr. Brennan's expectation of how Ford's subjective experience of his pain may evolve over time and how Ford will react to that subjective experience.[102]

The Court does not find Dr. Brennan's medical opinion concerning the probability that Ford will choose surgery in the future to be credible. It clearly appeared to the Court that Ford was very much opposed to having the suggested surgery, no matter what Dr. Brennan recommended. Any of Ford's testimony to the contrary is rejected by the Court as not being credible. Therefore, the Court finds that Ford has not sustained his burden of proof with respect to future surgery.[103]

As Ford has not established that it is more likely than not that he will pursue any potential suggested surgery in the future, and as the life care plan developed by Dr. Cowen is premised on Ford choosing to pursue such surgery,[104] the Court finds

---

[101] R. Doc. No. 127, at 39-40 (emphasis added).

[102] Dr. Eiserloh testified that he did know how Dr. Brennan could make "that crystal ball type of prediction." Ex. 73, at 87.

[103] The Court notes that it invited Ford to file a motion to continue the trial date so that he could pursue additional medical treatment, including surgery. *See* R. Doc. No. 89, at 1. Ford never requested a continuance.

[104] The following exchange between the Court and Dr. Cowen illustrates the problem:

THE COURT: Your plan is based on the plaintiff changing his mind and authorizing surgery?

THE WITNESS: Ultimately, yes, sir.

that the life care plan does not provide a credible estimate as to Ford's future medical expenses. The Court, therefore, will not consider it.

Without the life care plan, the Court finds that it does not have a sufficient evidentiary basis upon which to base an award for future medical expenses. For example, there is no indication that Ford's past medical expenses is an accurate and reasonable reflection of his medical expenses going forward.

As Potential Shipping correctly observes, "[t]here are simply too many variables and unknowns to predict the course of Ford's future medical treatment, if any, with any degree of probability."[105] Because any damages for future medical expenses would thus be speculative, the Court will not award them.

### vi.

With respect to Ford's future lost wages attributable to the incident, the Court has already concluded that Ford's pain does not prevent him from performing all work, although it prevents him from working as a forklift operator. Thus, to calculate any award for future lost wages, the Court must first consider the jobs that Ford can reasonably perform based on, for instance, his skills, age, geographic location, and physical pain level. In other words, the Court must consider the value of Ford's post-injury earning capacity.

Ford has not established his post-accident earning capacity by a preponderance of the evidence. Indeed, the evidence admitted at trial merely shows that Ford is *not incapable* of performing *all* work. The evidence does *not* establish the value of the

---

R. Doc. No. 127, at 216.
[105] R. Doc. No. 130, ¶ 88.

work that Ford can now reasonably perform, or even *what* specific work Ford can reasonably perform. Even Dr. Brennan—Ford's own treating physician—was reticent to opine on such matters without the benefit of a functional capacity evaluation, which Dr. Brennan had not requested be conducted before trial.

At the close of Ford's case, Potential Shipping directed the Court's attention to this evidentiary deficiency. In response, Ford has asked the Court to take judicial notice, pursuant to Federal Rule of Evidence 201(d), of federal regulations, information published by the U.S. Bureau of Labor Statistics, and a job database sponsored by the U.S. Department of Labor.[106] These materials include definitions for "light work" and "sedentary work," average wages for different occupations in the New Orleans area, and descriptions of various types of jobs. Ford argues that this information, when coupled with the evidence admitted at trial, would provide the Court with a sufficient evidentiary basis on which to base an award for future lost wages.

Potential Shipping objects to the motion on multiple grounds, including the fact that judicial notice of these materials would unfairly prejudice it and that, in any event, the information does not fill Ford's evidentiary void.[107]

"Because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)." *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d

---

[106] *See* R. Doc. No. 117; R. Doc. No. 123.
[107] *See* R. Doc. No. 125.

66, 70 (2d Cir. 1998); *see also In re Katrina Canal Breaches Litig.*, 324 Fed. App'x 370, 381 (5th Cir. 2009) ("[W]e note that Rule 201 should be exercised with caution."). In this instance, Potential Shipping exercised its right to point out an evidentiary hole in Ford's case at the close of his case. It was only then that Ford took steps to rectify the situation.

The Court is not convinced that judicial notice of the requested materials accomplishes the task of filling Ford's evidentiary void.[108] As Potential Shipping notes, "[t]ables and statistics showing what average workers in certain fields earn does not show what this particular plaintiff can do in the future, or what he can earn in the future, based on his particular training, skills, motivation and talents."[109] All that the Court can reasonably conclude from the evidence admitted at trial is that Ford is not incapable of performing all work. Even if it granted Ford's motion for

---

[108] Ford cites to two opinions that, in his view, illustrate that "courts in this circuit and Louisiana state courts have recognized that the absence of vocational testimony is not fatal to a plaintiff's claim for lost-future-earning capacity." R. Doc. No. 123, at 2 n.5 (citing *Barocco v. Ennis Inc.*, 100 Fed. App'x 965 (5th Cir. 2004) (per curiam), and *In the Matter of M&M Wireline & Offshore Serv., LLC*, No. 15-4999, 2017 WL 430063 (E.D. La. Jan. 31, 2017) (Brown, J.)). These opinions do not control here.

One opinion concerned whether an economic expert's testimony concerning future wage loss and loss of future earning capacity was admissible at trial where the economic expert did not consider the analysis of a vocational rehabilitation expert. *See In the Matter of M&M Wireline & Offshore Serv.*, 2017 WL 430063, at *5-*6.

The second opinion—a nonprecedential Fifth Circuit opinion—addressed *Louisiana* law, not federal maritime law. *Barocco*, 100 Fed. App'x at 697-69. Moreover, the Fifth Circuit panel that issued the opinion based its conclusion on the specific testimony offered at trial—testimony that the panel did not discuss in detail in its opinion. *See id.* at 969.

In any event, the Court is not stating that a plaintiff can prove his claim for future lost wages only if a vocational or rehabilitation expert testifies. The Court merely concludes that, after weighing the testimony and other evidence in this case, Ford has failed to meet his evidentiary burden with respect to his future lost wages.

[109] R. Doc. No. 125, at 7.

judicial notice, the Court could still not reach a conclusion as to what specific job *Ford* can do and what specific wage *Ford* can command without venturing into the realm of speculation.[110]  The Court is unwilling to engage in such conjecture.

The Court finds that Ford has not proven the value of post-accident earning capacity by a preponderance of the evidence and thus it will not award damages for future lost wages to Ford.  The Court further denies Ford's motion for judicial notice.

## vii.

Nevertheless, the Court will award Ford lost wages to cover the reasonable period of time post-trial that Ford may require to find suitable employment.

As the Court previously noted, Dr. Brennan had not lifted Ford's work restriction as of the trial date.  Dr. Brennan testified that his next appointment with Ford was scheduled for March 2018, at which time he expected to learn whether Ford planned to pursue surgery.  Moreover, Dr. Brennan testified that, if Ford elected not to pursue surgery, then he would tell Ford that Ford "needs to go try to live the rest of his life," including finding work.[111]

The Court has already concluded that the evidence admitted at trial does not establish by a preponderance of the evidence that Ford will pursue the surgery. Based on this finding, the Court finds that Ford will be in a position to begin searching for suitable employment after his March 2018 appointment with Dr. Brennan.  The record is unclear as to the exact timing of this appointment.

---

[110] The Court notes that, when questioned about particular types of jobs at trial—working at a cash register, working as a salesman—Ford did nothing more than give reasons why, even if he could do such work, he did not want to.
[111] R. Doc. No. 127, at 70.

During his testimony, Dr. Brennan did not provide the date in March when Ford's appointment was scheduled. Further, the medical record documenting Ford's January 4, 2018 appointment with Dr. Brennan—Ford's most recent appointment before trial—simply states that "[w]e will see [Ford] back in 2 months."[112]

The Court notes, however, that two months after January 4, 2018 is March 4, 2018, which is a Sunday. Given that the next day—March 5, 2018—is the closest weekday to the two-month mark after Ford's January 2018 appointment, the Court will use that date as the appointment date.

After carefully considering the issue, the Court will award Ford lost wages from the trial date (February 20, 2018) up to May 4, 2018, which compensates Ford for 60 days after the Court's selected appointment date. This period of time spans a total of 73 days.

The Court has already found Dr. McCoin's methodology for calculating past lost wages to be credible. Dr. McCoin calculated Ford's 2018 past lost wages to be $3,346, or $66.92 per day, as measured from the start of the calendar year to the trial date (50 days).[113]

Seventy-three days multiplied by $66.92 equals $4,885.16. The Court will therefore award Ford **$4,885.16** to compensate Ford for the amount of time that Ford may reasonably require to find suitable employment.

**viii.**

---

[112] Ex. 15, at 1.
[113] Ex. 72.

41

With respect to Ford's past and future pain and suffering attributable to the incident, the Court does not doubt that the incident resulted in real and sustained physical pain to Ford. For example, Ford testified that, despite the dissipation of the pain in his scrotum, he has had difficulty achieving and maintaining an erection, which has adversely affected his relationship with his wife.[114] Moreover, Ford testified as to how the pain resulting from the incident has altered his involvement with his children.

The Court finds that Ford has proven by a preponderance of the evidence both that he has experienced pain and suffering in the past, and that he will experience some pain and suffering in the future. Moreover, having considered all evidence admitted at trial, being well familiar with the case law, and having had the opportunity to observe Ford and directly hear his story, the Court finds that **$75,000** is fair and reasonable compensation for Ford's past pain and suffering, and that **$150,000** is fair and reasonable compensation for Ford's future pain and suffering. The Court will award these amounts to Ford as compensation for his pain and suffering.

## III.

Finally, the Court must consider the issue of prejudgment interest. "Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." *Offshore Marine Contractors, Inc. v. Palm Energy Offshore, L.L.C.*, 779 F.3d 345, 351 (5th Cir. 2015). "Admiralty courts

---

[114] The Court notes that Ford has never been treated by a urologist regarding any testicular pain or erectile dysfunction.

enjoy broad discretion in setting prejudgment interest rates." *Gator Marine Serv. Towing, Inc. v. J. Ray McDermott & Co.,* 651 F.2d 1096, 1101 (5th Cir. Unit A July 1981). "They may look to the judgment creditor's actual cost of borrowing money, to state law, or to other reasonable guideposts indicating a fair level of compensation." *Id.* (internal citations omitted).

The Louisiana Commissioner of Financial Institutions has set the judicial rate of interest for 2018 at 5% per annum.[115] The Court will adopt this same rate of interest.

## IV.

For the foregoing reasons,

**IT IS ORDERED** that Ford shall recover from Potential Shipping the total amount of **$260,748.61**, as set forth herein, as well as prejudgment interest in the amount of **5% per annum** and taxable costs.

**IT IS FURTHER ORDERED** that Ford's motion[116] for judicial notice is **DENIED**.

**IT IS FURTHER ORDERED** that, by **April 11, 2018**, Ford file a request for taxable costs with the Clerk through the procedures specified in Local Rule 54.3.

New Orleans, Louisiana, March 28, 2018.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[115] *See Judicial Interest Rate*, Louisiana State Bar Association, https://www.lsba.org/Members/JudicialInterestRate.aspx (last visited March 18, 2018).
[116] R. Doc. No. 117.